No. 14-2998

==========================================================

**IN THE**
**UNITED STATES COURT OF APPEALS**
**FOR THE THIRD CIRCUIT**

==========================================================

LAMONICA CROSS,
Plaintiff-Appellant,

v.

STATE OF NEW JERSEY, DIVISION OF CRIMINAL JUSTICE,
Defendant-Appellee.

_____

ON APPEAL FROM A FINAL JUDGMENT OF
THE UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF NEW JERSEY

Sat Below:  Mary L. Cooper, U.S.D.J.

_____

**BRIEF AND VOLUME I, PAGES A1-15, OF APPENDIX OF**
**PLAINTIFF-APPELLANT LAMONICA CROSS**

_____

Michael Confusione (MC-6855)
HEGGE & CONFUSIONE, LLC
P.O. Box 366
Mullica Hill, NJ 08062-0366
(800) 790-1550; (888) 963-8864 (fax)
mc@heggelaw.com
Counsel for Plaintiff-Appellant
Lamonica Cross

Michael Confusione
 Of Counsel and On the Brief

# **TABLE OF CONTENTS**

TABLE TO THE APPENDIX ...............................................................................iii

TABLE OF AUTHORITIES ..............................................................................viii

CORPORATE DISCLOSURE STATEMENT………………………………..........1

STATEMENT OF SUBJECT MATTER AND APPELLATE JURISDICTION.............. 1

STATEMENT OF THE ISSUES......................................................................... 1

STATEMENT OF THE CASE............................................................................. 2

STATEMENT OF FACTS ................................................................................2

STATEMENT OF RELATED CASES ................................................................15

STATEMENT OF STANDARD OF REVIEW ...................................................15

SUMMARY OF THE ARGUMENT ..................................................................16

ARGUMENT ....................................................................................................17

> The district court erred in granting defendant's motion for summary
> judgment and dismissing plaintiff's Title VII claim as a matter of law

Standard of Review                                                                              17

Governing Law                                                                                   18

The district court's errors below

> I.    The district judge improperly excluded consideration of proofs
>       submitted to the court on summary judgment that showed the
>       history of plaintiff's employment and defendant's failure to
>       promote plaintiff during her long tenure, culminating in the
>       failure to promote plaintiff to the Sergeant-State Investigator
>       position in question.                                                              21

II.    The district judge erred in failing to assess the sufficiency of
plaintiff's failure to promote claim under a mixed-motives analysis,
which was applicable because of at least three instances reflecting
direct evidence of prohibited animus by defendant.                  24

III.   Even if a mixed-motives analysis was not applicable, plaintiff
presented sufficient evidence to survive summary judgment on
a pretext theory.                                                   27

IV.    The district judge erred in failing to assess the sufficiency of plaintiff's
Title VII claim under a retaliation analysis.                       40

CONCLUSION ................................................................................................  42

ATTORNEY CERTIFICATES (Bar Membership, Certificate of Paper and
Electronic Filing and Service, Virus Check, Word Count Verification)...............Attached

# TABLE TO THE APPENDIX

## Volume I (bound with Appellant's Brief)

Notice of Appeal                                                           A1

Order, Judgment and Opinion of Honorable Mary L. Cooper,        A2-15
U.S.D.J. in favor of State of New Jersey, Division of Criminal
Justice against Lamonica Cross

## Volume II (bound separately)

Docket Entries                                                            A16-24

Complaint                                                                 A25-34

Motion to Dismiss Complaint                                               A35-42

Memorandum Opinion and Order granting in part defendant's
motion to dismiss complaint                                              A43-56

Answer                                                                   A57-65

Letter from plaintiff's counsel to district court re: discovery issues    A66-67

Ex. A to letter (defendant's responses to discovery)                      A68-82

Ex. B to letter (letter from plaintiff's counsel to defendant's counsel)  A83-86

Letter from defendant's counsel to district court re: discovery issues    A87-88

March 13, 2013 letter decision by district court on discovery issues       A89-92

Defendant's motion for summary judgment                                   A93-94

Defendant's statement of material facts in support of motion for
summary judgment                                                        A95-122

Certification of defendant's counsel in support of motion for summary judgment — A123-126

Exhibit A (Plaintiff's Complaint, dated June 28, 2011) — A127-38

Exhibit B (Plaintiff's Deposition Transcript dated January 22, 2013) — A139-202

Exhibit C (Order Dated January 26, 2012) — A203-04

Exhibit D (July 28, 2000 Offer Letter) — A205-07

Exhibit E (July 1, 2008 Letter) — A208-10

Exhibit F (Plaintiff's Resume dated February 5, 2000) — A211-13

Exhibit G (Plaintiff's Resume dated July 28, 2009) — A214-16

Exhibit H (Plaintiff's Continued Deposition Transcript dated March 28, 2013) — A217-39

Exhibit I (Plaintiff's Answers to Defendant's First Set of Interrogatories) — A240-67

Exhibit J (Performance Evaluation dated February 24, 2004) — A268-75

Exhibit K (Performance Evaluation dated August 11, 2005) — A276-82

Exhibit L (Performance Evaluation dated March 24, 2006) — A283-89

Exhibit M (Performance Evaluation dated February 1, 2007) — A290-96

Exhibit N (Nancy Beiger Deposition Transcript dated February 27, 2013) — A297-332

Exhibit O (Rita Binn Deposition Transcript dated April 3, 2013) — A333-50

Exhibit P (Lieutenant Riley EEO Interview dated June 8, 2010)          A351-53

Exhibit Q (Sherri Stevens Deposition Transcript dated April 2, 2013)          A354-73

Exhibit R (Hector Montano EEO Interview dated January 7, 2011)          A374-76

Exhibit S (Performance Evaluation dated January 14, 2008)          A377-82

Exhibit T (Beiger E-mail dated February 26, 2008)          A383-84

Exhibit U (Beiger E-mail dated February 27, 2008)          A385-86

Exhibit V (Notice of Job Vacancy dated July 17, 2009)          A387-88

Exhibit W (Sergeant Position Posting Process)          A389-90

Exhibit X (Allan Buecker Deposition Transcript dated April 2, 2013)          A391-415

**Volume III** (bound separately)

Exhibit Y List of Applicants – Sergeant State Investigator (2009 Sgt. Promo File 4-5)          A416-18

Exhibit Z List of Applicants, # of Lieutenant Recommendations (2009 Sgt. Promo File 77)          A419-20

Exhibit AA Written Examination Questions (emails – Srgt. exam 2-3)          A421-23

Exhibit BB Panel Oral Interviews – Sergeant (2009 Sgt. Promo File 1971)          A424-25

Exhibit CC Results from Sgt. Interviews 9/21 and 9/22 (Results from Sgt Interviews 000001)          A426-27

Exhibit DD Paul Castellvi EEO Interview dated June 21, 2010
(Cross OAG EEO 122-125)                                          A428-31

Exhibit EE Resumes of Phase IV Candidates (Resumes 00001-34)    A432-66

Exhibit FF E-mail from Angela LaBelle dated October 13, 2009
(emails – Srgt. exam 000071)                                    A467-68

Exhibit GG EEO Final Report dated February 22, 2001, with
attached exhibits (Cross OAG EEO 68-178)                        A469-575

Exhibit HH Determination Letter dated February 15, 2011
(Cross OAG EEO 20-23)                                           A576-580

Plaintiff's Statement of Material Facts in opposition to defendant's
motion for summary judgment                                     A581-617

Affidavit of plaintiff's counsel in opposition to summary judgment    A618-21

Exhibit A (January 22, 2013 deposition of Lamonica Cross)       A622-56

Exhibit B (March 28, 2013 deposition of Lamonica Cross)         A657-68

Exhibit C (February 27, 2013 deposition of Nancy Beiger)        A669-746

Exhibit D (April 3, 2013 deposition of Rita Binn)               A747-75

Exhibit E (April 2, 2013 deposition of Allan Buecker)           A776-800

**Volume IV** (bound separately)

Exhibit F (April 2, 2013 deposition of Sherri L. Stevens)       A801-19

Exhibit G (Compilation of New Hires)                            A820-25

Exhibit H (Resume of Lamonica Cross)                            A826-30

Exhibit I (State of New Jersey Notice of Job Vacancy)           A831-32

Exhibit J (Results from Written Test)                                    A833-36

Exhibit K (New Jersey Division of Criminal Justice Panel Oral
Interviews, Sergeant)                                                    A837-69

Exhibit L (Letter to Valerie Eager, Esquire with attachments)           A870-81

Exhibit M (EEO classification of candidates for promotion to
Sergeant)                                                               A882-83

Exhibit N (promotional list for sergeant dated October 13, 2009)        A884-85

Exhibit P (EEO Investigation into complaint 09-228)                     A886-95

Exhibit Q (Calendar of Events for L. Cross)                             A896-99

Exhibit R (Sergeant Posting Process)                                    A900-01

Exhibit S (gender/race statistics)                                      A902-03

Exhibit O (State/Civil Investigator Evaluation for Cross, Lamonica)     A904-14

Certification of Defendant's Counsel in further support of
motion for summary judgment                                             A915-16

Exhibit A (Certification of Allan Buecker, dated January 16,
2013)                                                                   A917-19

# TABLE OF AUTHORITIES

## *Cases*

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)  17

*Barber v. CSX Distribution Servs.*, 68 F.3d 694, 700-01 (3d Cir. 1995)  30

*Brown v. J. Kaz, Inc.*, 581 F.3d 175, 182 (3d Cir. 2009)  20, 27

*Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548 (1986)  15, 17

*Desert Palace, Inc. v. Costa*, 539 U.S. 90, 101, 123 S.Ct. 2148, 156 L.Ed.2d 84 (2003)  20, 24

*Ezold v. Wolf, Block, Schorr and Solis-Cohen*, 983 F.2d 509, 522 (3d Cir. 1992), cert. denied, 510 U.S. 826, 114 S.Ct. 88, 126 (1993)  20

*Fitzgerald v. Henderson*, 251 F.3d 345, 365 (2d Cir. 2001), cert. denied, 536 U.S. 922, 122 S.Ct. 2586 (2002)  22

*Fuentes v. Perskie*, 32 F.3d 759, 763 (3d Cir. 1994)  18, 19

*Griffin v. Board of Regents*, 795 F.2d 1281, 1287 (7th Cir. 1986)  39

*Hazelwood School District v. United States*, 433 U.S. 299, 307-08, 97 S.Ct. 2736, 2741, 53 L.Ed.2d 768 (1977)  39

*Josey v. John R. Hollingsworth Corp.*, 996 F.2d 632, 638 (3d Cir. 1993)  39

*McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-03 (1973)  18

*Miller v. CIGNA Corp.*, 47 F.3d 586, 594 (3d Cir. 1995)(en banc)  21

*Monroe v. Beard*, 536 F.3d 198, 206 (3d Cir. 2008), cert. denied, 556 U.S. 1135, 129 S.Ct. 1647 (2009)  15, 17

*Moore v. City of Philadelphia*, 461 F.3d 331, 340-41 (3d Cir. 2006)  40, 41

*Mosaid Technologies Inc. v. Samsung Electronics Co., Ltd.*, 348 F.Supp.2d 332, 335 (D. N.J. 2004)   30, 31

*National R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 113-14, 122 S.Ct. 2061 (2002)   22

*Ostrowski v. Atlantic Mut. Ins. Cos.*, 968 F.2d 171, 182 (2d Cir. 1992)   20

*Payne v. Travenol Laboratories, Inc.*, 673 F.2d 798, 817 (5th Cir.), cert. denied, 459 U.S. 1038, 103 S.Ct. 451-52, 74 L.Ed.2d 605 (1982)   39

*Pollock v. Am. Tel. & Tel. Long Lines*, 794 F.2d 860, 864 (3d Cir. 1986)   17

*Price Waterhouse v. Hopkins*, 490 U.S. 228, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989)   21, 27

*Schmid v. Milwaukee Elec. Tool Corp.*, 13 F.3d 76, 79 (3d Cir. 1994)   31

*Slagle v. County of Clarion*, 435 F.3d 262, 266 (3d Cir. 2006)   40

*Starceski v. Westinghouse Elec. Corp.*, 54 F.3d 1089, 1096 (3d Cir. 1995)   20, 24

*United Air Lines, Inc. v. Evans*, 431 U.S. 553, 558, 97 S.Ct. 1885, 1889, 52 L.Ed.2d 571 (1977)   22, 23

*Warren v. Halstead Indus., Inc.*, 802 F.2d 746, 753 (4th Cir. 1986)   23

*McDevitt v. Bill Good Builders, Inc.*, 175 N.J. 519, 528, 531 (2003)   27

## <u>*Statutes and Rules*</u>

*28 U.S.C. § 1291*   1

*28 U.S.C. § 1331*   1

*F.R.A.P. 32(a)(7)*   46

*Fed. R. Civ. P. 56(c)*   17

## CORPORATE DISCLOSURE STATEMENT

Not applicable.

## STATEMENT OF SUBJECT MATTER AND
## APPELLATE JURISDICTION

The district court had jurisdiction pursuant to 28 U.S.C. § 1331. A final order dismissing on summary judgment plaintiff's Title VII claim against defendant was entered on May 14, 2014. (A2-15). A notice of appeal was filed on June 12, 2014 by plaintiff. (A1). This Court has appellate jurisdiction pursuant to 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

1)    Did the district court err in failing to consider and assess the proofs of defendant's discriminatory practices and disparate treatment of plaintiff that occurred before the promotion in question? (A2-15)

2)    Did the district court err in failing to assess plaintiff's Title VII claim under a mixed-motives analysis? (A2-15)

3)    Did the district court err in ruling that plaintiff's Title VII claim failed under a burden shifting, pre-text theory? (A2-15)

4)    Did the district court err in failing to assess plaintiff's claim under a retaliation standard? (A2-15)

## STATEMENT OF THE CASE

Lamonica Cross sued her employer for violations of Title VII of the Civil Rights Act and New Jersey's Law Against Discrimination.  The district court dismissed plaintiff's claims on the pleadings except for her Title VII claim centering on defendant's decision not to promote her in 2009.  (A43-56).

Defendant then moved for summary judgment per Fed. R. Civ. Pr. 56 on the remaining Title VII claim.  Plaintiff opposed.  By Order and Memorandum Opinion dated May 14, 2014, the district judge granted defendant's motion and dismissed plaintiff's Title VII claim with prejudice.  (A2-15).  Plaintiff filed a Notice of Appeal to this Court on June 12, 2014.  (A1).

## STATEMENT OF FACTS

### Plaintiff's Employment History with Defendant

Plaintiff is an African-American female.  She previously served as a municipal police officer for Winslow Township, New Jersey, where she was a member of the narcotics task force.  In August 2000, she began working with New Jersey's Division of Criminal Justice ("DCJ") as a State Investigator II.  (A5-8, 826-30).  She worked in the DCJ Medicare Fraud Unit from 2000-2001, the DCJ Drug Diversion Unit followed by the Major Narcotics Unit from 2001-2002, and then the DCJ Prosecutor and Police Unit from 2002-2007.  In 2007, plaintiff was

transferred to the Office of Insurance Fraud ("OIFP"), Auto Fraud Unit, and in February 2008 she was reassigned to the OIFP, Property and Casualty Unit. In approximately December 2012 or January 2013, plaintiff was transferred to the OIFP, Medicaid Fraud Unit, where she remains employed as a Detective I. (A5-8).

Despite these changes in units, plaintiff remained at the same "State Investigator II" level throughout her employment with defendant. In 2008, the name of plaintiff's title was changed from State Investigator II to Detective I. This change was not a promotional action, however; but a change in name only. The title of Detective I was equivalent to the old title of State Investigator II. (A5-8).

**Plaintiff's discrimination claim**

The dispute below centered on plaintiff's application for a promotion. On or about July 23, 2009, plaintiff applied for a promotion to the position of Sergeant-State Investigator. Pursuant to a job vacancy notice, candidates for the Sergeant-State Investigator position were required to have a bachelor's degree and a minimum of five years of investigatory experience as a sworn law enforcement officer. The promotion process for the position consisted of four phases: "1) Credential Review/Lieutenant Recommendations; 2) Written Interview; 3) Panel Interview consisting of Deputy Chiefs and Deputy Attorneys General; and 4) An executive Interview consisting of senior and executive staff." (A5-8).

3

Approximately ninety-six candidates applied for the position.  Plaintiff passed the first phase of the process – the credential review/Lieutenant recommendations, because she had a bachelor's degree and a minimum of five years of investigatory experience as a sworn law enforcement officer.  Plaintiff also passed the second phase of the process – the written interview – which consisted of a written examination that was graded blindly by Lieutenants.  (A5-8)

Plaintiff, along with approximately 30 of the initial 96 applicants, moved onto the third phase of the promotion process – the panel interview.  The interview panel consisted of the five Deputy Chiefs at the time (one was a white female and one was an African-American female).  (A5-8).  In the district court below, the DCJ contended that plaintiff performed poorly on the phase III panel interview, and that it was because of her poor performance on the panel interview that she did not move on to phase IV and ultimately was not promoted.  (A5-8).

## Plaintiff's proofs of disparate treatment

Plaintiff contended that the DCJ's failure to promote her to the Sergeant-State Investigator position was the culminating event in a history of race and gender discrimination against her during her employment with the DCJ.  (A5-8).  Her "first experiences with questionable treatment" within DCJ occurred after she was assigned to the Prosecutor's and Police Unit in 2002 under the supervision of

Lt. Ken White (in August 2008, White again became plaintiff's supervisor). In addition to plaintiff, White was the supervisor of two white males and one African-American male. (A289). Plaintiff contended that Supervisor White treated her differently than the males under his supervision. (A473). After plaintiff came under White's supervision, she noticed that she was not receiving any case assignments, notwithstanding her experience in both the Division and as a local law enforcement officer previously. Plaintiff was "handed embarrassingly minimal assignments such as acting as a courier to deliver discovery materials. While this was occurring, Investigator James Wrightson, who was one of the white males[,] was receiving the bulk of the cases." (A259).

Plaintiff testified that the "questionable treatment" by Lt. White began not long after she came under his supervision, when she "noticed that I was not getting any cases, but other people were getting cases." Plaintiff testified that she was receiving minimal assignments from Lt. White based upon her race and gender. (A99, 259-60). Plaintiff noted that Lt. White "stated to plaintiff that there was a 'good old boy network' and that plaintiff was not part of that network." (A245).

In another instance noted by plaintiff in her submissions below, plaintiff detailed her disparate treatment as a member of the DCJ's Shooting Response Team. Because of the emergency nature of the team, "team members in plaintiff's

5

unit were provided with vehicles equipped with lights and a siren" – "except plaintiff, the lone female. This became quite distressing when on one occasion she had to respond to an incident by driving through rush hour traffic on Interstate 295 using only a dashboard dome light." (A259). White was denying plaintiff training opportunities as well, which further dashed any hope for advancement. (A587-88). "I was trying to go to training, this FBI Investigative School that lasts for two weeks. And the year before that, I had put in a request to go, and it was denied. And then the following year, I wrote up a memo and I asked to go again, and it was denied." (A587-88).

Plaintiff affirmed, "Eventually, a number of DAG's [Deputy Attorney Generals with whom plaintiff worked] who were aware of plaintiff's credentials complained about the disparity in case assignments and they became more equitable. Plaintiff believes that Ken White at this time was counseled about the manner in which plaintiff had been treated and since that time he has treated plaintiff in an appropriate fashion." (A259-60, 384). After plaintiff was denied a second time to attend the FBI investigative school, for example,

> I went and I told Jack McConnell about it, and he said this is
> ridiculous. But then Jack told me, well, what you did wrong was you
> should have came to me first, then I would go into Kenny's office,
> meaning Jack, and Jack was supposed to say how great this case -- I'm
> sorry, how great the training course was. And after he builds up the
> training course and it's good for me to go, then I was supposed to

come in, and that's how I would get approved. So after that, I'm just sitting at my desk, and Jack McConnell comes back, and he said he just spoke with Nancy because he believed and he called Kenny a racist." … "And shortly after he came back, I saw Nancy Beiger go into Kenny's office and close the door." … "So after that happened, he started treating me equal."  "I started getting cases such as the aggravated sexual assault cases. I started being able to go to training."

[A588, 629-30, 636]

In February 2007 plaintiff came under the supervision of Lieutenant Barry Riley, who also subjected her to disparate treatment, plaintiff contended in the court below.  (A259-60).  From February 2007 through February 2008, plaintiff was "harassed" and treated in a disparate fashion by her then supervisor Lt. Riley in the OIFP, Auto Unit.  As soon as plaintiff came under Lt. Riley's supervision, "he subjected her to hyper-scrutiny," including continually questioning plaintiff about her whereabouts. (A103, 259 ).  The scrutiny was "so intense," plaintiff affirmed below, that she "began maintaining a diary of the more significant events to protect herself."  Riley questioned plaintiff repeatedly about her whereabouts – without basis to do so and unlike his treatment of others under his supervision. (A259-60).  Riley also made unsolicited comments that plaintiff was not fit for promotion, stating in a September 17, 2007 meeting, "If I had to write a promotional justification for you it would be shallow."  Plaintiff continued to receive disparate treatment in regard to vehicle distribution as well.  (A260).

7

Plaintiff notified her employer about the disparate treatment.  In February 2007, plaintiff advised Deputy Chief Nancy Beiger, in a meeting, that Supervisor Riley had harassed and discriminated against her.  Plaintiff was transferred to a new supervisor as a result.  (A486, 535).  In June 2009, plaintiff spoke with Hester Agudosi about disparate treatment:  "Barry Riley abruptly retired the following month."  (A592).

When July 2009 arrived, and plaintiff applied for the Sergeant-State Investigator position, plaintiff contended that the disparate treatment continued – now reflected in the failure to promote her.  Plaintiff contended that certain questions asked by the phase III panelists were discriminatory.  (A5-8).  Two questions in particular were aimed at disclosing whether plaintiff had previously made Equal Employment Opportunity ("EEO") complaints against the DCJ: (1) "Did you ever have a conflict in the DCJ with anyone and how did you resolve it?"; and (2) "What 'negatives' do you perceive to exist within the Division."  (A5-8).  Plaintiff testified in her deposition below that she was unable to answer the second question. Plaintiff contended that these questions led her to believe that the panelists were aware of an EEO complaint she had filed previously.  (A5-8).  Plaintiff testified that the questions "put me at a disadvantage," and that the questions posed by the panelists varied between the applicants.  The panelists

8

tailored their questions specifically toward plaintiff in light of her race and gender and prior EEO complaint.  (A5-8).

Though defendant claimed that plaintiff was not promoted because she did not answer the interview questions well, plaintiff noted in the court below inconsistencies that would permit a reasonable jury to find this reason offered by DCJ unworthy of credence.  Plaintiff admitted that there were two questions for which she did not have an immediate response.  She hesitated to answer the first question – "how she would handle a disagreement with a co-worker" – because the first example she thought of was that she filed an EEO complaint (which was pending at the time), but she eventually thought of another example and provided her answer.  The second question – "what are the negatives within the division" – was "set up for failure."  This question is "similar to the question 'when did you stop beating your wife?' as it presumes that the issue under discussion is valid and that you agree that it is or had occurred."   Plaintiff asked for additional time to answer the question, and when she later offered to provide the panel with her response, "she was told not to bother."  (A5-8)

Contrary to defendant's claims, plaintiff did not have a "deer in the headlights look" during her interview, noting she is an experienced interviewer and has worked undercover.  The depositions showed inconsistencies in the

9

defendant's explanation for this failure to promote plaintiff. Deputy Chief Binn stated that plaintiff did not answer the question. (A764). First Deputy Chief Beiger could not remember what question caused the alleged look. (A726). A reasonable juror could believe that she would not and did not display a "deer in the headlights look" during the interview as defendant claimed and did not perform poorly in the interview. Indeed, Deputy Chief Beiger, in her deposition, testified "we were all impressed with the people who interviewed. We were very impressed with the whole panel. It was a very difficult decision…" (A324). Beiger's statement contradicted the DCJ's claim during the litigation below that plaintiff had a "poor performance" during the interview and that this was the reason for her non-promotion.

Plaintiff contended that the questions put to her were part of a subjective interview, "a ready tool for discrimination," and reflective of the disparate treatment plaintiff had received throughout her tenure at the DCJ. (A10-12, 263). Defendant provided no other reason for its decision not to promote plaintiff. The interview sheets and current resumes of the candidates were destroyed by the defendant, moreover, (A796-97), precluding assessment of defendant's comments about the other individual candidates, how they performed on the interview, etc. Because the notes were destroyed, we do not know if the questions asked of each

10

candidate were substantially similar.  All of this added further to the basis on which a jury could find that the defendant's proffered reason for not promoting plaintiff was pre-textual, plaintiff contended in the district court below.

Plaintiff also submitted to the court below proofs showing how qualified she was for the Sergeant-State Investigator position.  She was evaluated for her work performance in 2009 and she was given a rating of four, "exceeds expectations." Plaintiff was better qualified than the majority of the applicants because she had 20 years of law enforcement experience; she was diversified and her experience included working as a patrol officer, on a narcotics task force, in a Medicaid fraud unit, in drug diversion, in the narcotics unit, she's been loaned out to County prosecutor's offices doing undercover buys, she has been on the shooting response team, where she was also a lead detective.  She had completed administrative investigations and Internal Affairs Investigations. Plaintiff listed Bob Stemmer, currently a Lieutenant with only 14 years of experience, as being less qualified than she. She also stated that both Noelle Hall and Tracy Keller, white females had fewer years of employment and their experience was only with the Division of Criminal Justice.  Jon Powers, Andrea Salvatini and Joseph Jaruszewski were other individuals, all are white, who were on the list, and plaintiff identified them as individuals with fewer years of experience and less well rounded experience.

11

Sherri Stevens, the lone African-American, female to move onto the final phase IV

of the promotion process for the Sergeant-State Investigator position, ultimately

was not promoted to the job either. (A801-19). This added to the basis for a jury's

finding that the failure to promote plaintiff was part of the disparate treatment

plaintiff received because of her race and gender, plaintiff contended. (A615-17).

After defendant did not promote plaintiff to the Sergeant-State Investigator

position, plaintiff spoke with Deputy Chief Beiger. "She advised me that in her

opinion my delay in responding to the two questions … hurt my candidacy."

Plaintiff noted, however, that "[t]oward the end of the conversation she stated that I

had 'to learn to get along.'" Plaintiff affirmed, "I do not know of anything that

would have triggered this comments, other than my pending EEO complaint."

(A489). Plaintiff noted a conversation with Lieutenant White as well, who told

plaintiff that she should have "hope for the future because the administration was

trying to change the promotion process because admittedly, 'in the past it has been

the good old boy network.'" (A489). These proofs added further to the basis on

which a reasonable jury could find unlawful discrimination, plaintiff contended.

Plaintiff contended that the failure to promote her in 2009 was just part of

the disparate treatment of black females for promotional opportunities. (A488).

Though Lieutenant White (when confronted by investigators about plaintiff's

disparate treatment accusations) denied discriminating against plaintiff in any

manner, and said that he considered plaintiff a very good investigator, (A577-78),

the fact is that plaintiff was not promoted or even submitted for promotion by

Lieutenant White.  As plaintiff affirmed, White's "very positive" evaluations

contrasted sharply with "White's behind closed doors actions to derail the

Plaintiff's career:"

> For instance "in 2004, I requested a promotion, and Kenny told me to
> put it in writing, and he said put it in writing and give it -- and if
> Nancy Beiger has any suggestions or has anything to add or whatever,
> he would let me know," and then "a year later, in 2005, we had a unit
> meeting where Nancy Beiger was there, Kenny and some other people
> that Nancy Beiger supervised. Nancy asked us all for our resumes
> because she was putting us in for promotion. I said, did you get the
> memo I submitted to Kenny, she said no."  In addition, later in
> connection with the promotion that is the subject of this action: "I'm
> actually surprised [from a review of documents produced in
> discovery] that Kenny White did not recommend me since I was
> under him for five years, and I notice that Kenny White recommended
> one individual, a retired trooper that he never supervised."
> "Lieutenant White, although I was under him for five years and he
> wrote me my evaluation that I was an asset to the Division and that I
> had been put in for promotion, I was considered for a promotion years
> ago, never recommended me."  [A586, 599-601]

This was reflected in plaintiff's history of employment with the defendant

and in the DCJ's employment statistics overall.  Plaintiff noted in her submissions

below that currently within the DCJ there was only one female lieutenant (white),

no black women deputy chiefs, no black women lieutenants and no black women

sergeants.  (A598)  Of the 26 lieutenants within the DCJ in 2008, three were black males, four were white females, and the rest were white males. There were no black females.  (A606)   Since 2010, the DCJ had hired 22 people, but only one was African-American, a female, who was placed in the position of Investigator Trainee; there were no hires for positions that carried a gun.  Of the minorities that the DCJ did hire, they were secretaries or tech aides. (A616).  This disparity was consistent with plaintiff's own personal experience during her employment with the DCJ.  As plaintiff affirmed below:  "I have seen white males with less law enforcement experience than myself quickly advance.  Over the last four years, virtually no blacks have been hired.  Presently out of 72 superior officers (Sergeant to Deputy Chief) there is only one black female, Deputy Chief Binn… Furthermore, this situation is being exacerbated by the fact that over the last few years most of the new hires have been white males."  (A489).

**The district court's ruling below**

After citing the burden shifting analysis applicable to pretext discrimination claims, the district judge ruled, "The Court need not address the *prima facie* case portion of the *McDonnell Douglas* burden-shifting framework because DCJ articulates a legitimate, nondiscriminatory reason for not promoting the plaintiff, and the plaintiff failed to produce evidence of pretext."  (A10).

14

The plaintiff has proffered no evidence that gives rise to a genuine issue of material fact. The evidence rather demonstrates that the panelists perceived the plaintiff to have performed poorly during her panel interview. Due to her performance on the panel interview, the plaintiff was ranked second to last – number 30 out of 31 – by the panelists. Also of note, though not dispositive, is the fact that Sherri Stevens, another African-American female, was found by the panel to have performed well during her panel interview. She, along with nineteen other applicants, advanced to the phase IV executive interview… The plaintiff's poor performance on the panel interview is a legitimate, non-discriminatory reason for not promoting her. The plaintiff has not proffered any evidence tending to show that DCJ's explanation for the employment decision is pretextual. The plaintiff accordingly is not able to defeat summary judgment.  [A14]

## STATEMENT OF RELATED CASES

None.

## STANDARD OF REVIEW

The Court of Appeal exercises plenary or *de novo* review over a district court's grant of summary judgment.  Monroe v. Beard, 536 F.3d 198, 206 (3d Cir. 2008), cert. denied, 556 U.S. 1135, 129 S.Ct. 1647 (2009).  "[S]ummary judgment is proper 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'"  Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (quoting Fed. R. Civ. P. 56(c)).

## SUMMARY OF THE ARGUMENT

The district judge improperly excluded consideration of proofs submitted to the court on summary judgment that showed the history of plaintiff's employment and defendant's failure to promote plaintiff during her long tenure, culminating in the failure to promote plaintiff to the Sergeant-State Investigator position.

The district judge erred in failing to assess the sufficiency of plaintiff's gender and race discrimination claim under a mixed-motives analysis, which was applicable because of at least three instances reflecting direct evidence of prohibited animus by defendant.

Even if a mixed-motives analysis was not applicable, plaintiff's claim did not fail as a matter of law under a pretext theory. A reasonable jury could find that defendant's claimed reason for failing to promote plaintiff (that she did not perform well on the third, interview phase of the selection process) was pre-textual, and that the actual reason for the non-promotion was, at least in part, because of plaintiff's race and/or gender in violation of Title VII.

Finally, the judge erred in failing to assess the sufficiency of plaintiff's Title VII claim under a whistle-blower analysis, which was applicable because plaintiff had a pending EEO complaint against Lieutenant Barry Riley at the time she applied for the Sergeant-State Investigator position. A reasonable jury could find

16

that the questions posed to plaintiff during the interview phase reflected the DCJ's

discrimination against plaintiff for her complaint lodged against Lieutenant Riley.

## ARGUMENT

### THE DISTRICT COURT ERRED IN GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND DISMISSING PLAINTIFF'S TITLE VII CLAIM AS A MATTER OF LAW.

### Standard of Review

The Court of Appeal exercises plenary review over a district court's grant of

summary judgment.  Monroe, 536 F.3d at 206.  "[S]ummary judgment is proper 'if

the pleadings, depositions, answers to interrogatories, and admissions on file,

together with the affidavits, if any, show that there is no genuine issue as to any

material fact and that the moving party is entitled to a judgment as a matter of

law.'"  Celotex Corp., 477 U.S. at 322; Fed. R. Civ. P. 56(c).  In deciding a motion

for summary judgment, the Court must construe the facts and inferences in a light

most favorable to the non-moving party.  Pollock v. Am. Tel. & Tel. Long Lines,

794 F.2d 860, 864 (3d Cir. 1986).  The role of the Court is not "to weigh the

evidence and determine the truth of the matter, but to determine whether there is a

genuine issue for trial."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249, 106

S.Ct. 2505, 91 L.Ed.2d 202 (1986).

**Governing Law**

An employee alleging a failure to promote claim under Title VII can proceed with indirect or direct evidence of discrimination.

**Pretext Theory**

Where the plaintiff proceeds indirectly via a "pretext" theory, proof of discrimination involves a three-step process and proceeds under the burden-shifting framework established in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-03 (1973).  The first step requires the plaintiff to establish a *prima facie* case of discrimination.  Id. at 802.  The employee must demonstrate: (1) that she was a member of a protected class; (2) that she applied and was qualified for a job for which the employer was seeking applicants; (3) that, despite her qualifications, she was rejected; and (4) that another, not in the protected class, was treated more favorably.  Id.

If the employee succeeds in establishing a *prima facie* case, the burden shifts to the employer to articulate some legitimate, nondiscriminatory reason for the failure to promote.  Fuentes v. Perskie, 32 F.3d 759, 763 (3d Cir. 1994).  The burden then shifts back to the employee to produce sufficient evidence to permit a reasonable jury to find that employer's proffered reason is merely a pretext for discrimination.  Id.  "[T]o avoid summary judgment, the plaintiff's evidence

18

rebutting the employer's proffered legitimate reasons must allow a factfinder reasonably to infer that each of the employer's proffered non-discriminatory reasons was either a *post hoc* fabrication or otherwise did not actually motivate the employment action (that is, the proffered reason is a pretext)." <u>Fuentes</u>, 32 F.3d at 764. To discredit the employer's proffered reason, "the plaintiff cannot simply show that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent." <u>Id.</u> at 765. The employee "must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them 'unworthy of credence,' and hence infer 'that the employer did not act for [the asserted] non-discriminatory reasons.'" <u>Id</u>. The plaintiff must raise a genuine issue of material fact regarding whether the employer's proffered explanation is pretextual or whether, the retaliatory discrimination was more likely than not a determinative factor in the decision. <u>Id</u>.

**<u>Mixed-Motives Theory</u>**

A plaintiff may also proceed with her Title VII claim via direct evidence of discrimination under a "mixed-motives" theory. <u>See</u> <u>Ezold v. Wolf, Block, Schorr</u>

and Solis–Cohen, 983 F.2d 509, 522 (3d Cir. 1992)("Intentional discrimination in employment cases fall within one of two categories: 'pretext' cases and 'mixed-motives' cases"), cert. denied, 510 U.S. 826, 114 S.Ct. 88, 126 L.Ed.2d 56 (1993). In a "mixed-motives" case, the employee must produce direct evidence of discrimination by the employer.  Conduct or statements which reflect directly the alleged discriminatory attitude and which bear directly on the contested employment decision constitute direct evidence.  Starceski v. Westinghouse Elec. Corp., 54 F.3d 1089, 1096 (3d Cir. 1995); see also Ostrowski v. Atlantic Mut. Ins. Cos., 968 F.2d 171, 182 (2d Cir. 1992).  In order to trigger a mixed-motive framework, a plaintiff need only present sufficient evidence for a reasonable jury to conclude, by a preponderance of the evidence, that "race, color, religion, sex, or national origin was a motivating factor for any employment practice."  Desert Palace, Inc. v. Costa, 539 U.S. 90, 101, 123 S.Ct. 2148, 156 L.Ed.2d 84 (2003).

Under the "mixed-motives" analysis, if the plaintiff shows "by direct evidence that an illegitimate criterion was a substantial factor in the [employment] decision," the burden shifts to the defendant "to convince the trier of fact that it is more likely than not that the decision would have been the same absent consideration of the illegitimate factor."  Brown v. J. Kaz, Inc., 581 F.3d 175, 182 (3d Cir. 2009)(quoting Price Waterhouse v. Hopkins, 490 U.S. 228, 109 S.Ct.

1775, 104 L.Ed.2d 268 (1989)(O'Connor, J., concurring)).  If the plaintiff adduces "direct evidence" of discrimination, "and the evidence as a whole permits a conclusion that both permissible and impermissible considerations played a role in the employer's decision, the plaintiff need only show that the unlawful motive was a substantial motivating factor in" the termination decision.  Miller v. CIGNA Corp., 47 F.3d 586, 594 (3d Cir. 1995)(*en banc*); Price Waterhouse, supra, 490 U.S. 228.  If that is accomplished, the burden of persuasion then shifts to the defendant to prove the discrimination was not a "but-for cause" of the unfavorable employment action.  Miller, 47 F.3d at 594.  In other words, the employer "must show that its legitimate reason, standing alone, would have induced it to make the same decision."  Price Waterhouse, 490 U.S. at 252; Mardell, 31 F.3d at 1225 n. 6.

**The district court's errors below**

I.    **The district judge improperly excluded consideration of proofs submitted to the court on summary judgment that showed the history of plaintiff's employment and defendant's failure to promote plaintiff during her long tenure, culminating in the failure to promote plaintiff to the Sergeant-State Investigator position in question.**

In assessing plaintiff's Title VII claim below, the district judge considered plaintiff's failure to promote claim in a vacuum, divorced from the prior discrimination that plaintiff's proofs detailed during the years of her employment leading to the promotion in question.  Though the district judge had previously

21

ruled that any claim of discrimination that arose from the defendant's treatment of

plaintiff prior to the 2009 promotion was barred, (A43-56), this did not mean that

the *proofs* from this time period were not relevant to plaintiff's failure to promote

claim.  In <u>National R.R. Passenger Corp. v. Morgan</u>, 536 U.S. 101, 113-14, 122

S.Ct. 2061 (2002), the Supreme Court noted that even where a claim of past

discrimination is barred from being asserted as a legal claim for relief, the evidence

relating to the past conduct of the employer "may constitute relevant background

evidence in a proceeding in which the status of a current practice is at issue."

> We derive several principles from these cases. First, discrete
> discriminatory acts are not actionable if time barred, even when they
> are related to acts alleged in timely filed charges. Each discrete
> discriminatory act starts a new clock for filing charges alleging that act.
> The charge, therefore, must be filed within the 180– or 300–day time
> period after the discrete discriminatory act occurred. The existence of
> past acts and the employee's prior knowledge of their occurrence,
> however, does not bar employees from filing charges about related
> discrete acts so long as the acts are independently discriminatory and
> charges addressing those acts are themselves timely filed. **Nor does the
> statute bar an employee from using the prior acts as background
> evidence in support of a timely claim.**  [emphasis added]

<u>See also</u> <u>United Air Lines, Inc. v. Evans</u>, 431 U.S. 553, 558, 97 S.Ct. 1885, 1889,

52 L.Ed.2d 571 (1977); <u>Fitzgerald v. Henderson</u>, 251 F.3d 345, 365 (2d Cir. 2001),

<u>cert. denied</u>, 536 U.S. 922, 122 S.Ct. 2586 (2002)("A statute of limitations does

not operate to bar the introduction of evidence that predates the commencement of

the limitations period but that is relevant to events during that period"); <u>Warren v.</u>

Halstead Indus., Inc., 802 F.2d 746, 753 (4th Cir. 1986)("Even where such past discriminatory acts are time-barred for purpose of a particular claim, the Supreme Court has stated that this type of showing 'may constitute relevant background evidence in a proceeding in which the status of a current practice is at issue'") (citing United Air Lines v. Evans, 431 U.S. 553, 558, 97 S.Ct. 1885, 52 L.Ed.2d 571 (1977)).

Thus, in this case, though the district court ruled that the prior acts of discrimination by defendant could not be brought as claims, this evidence was relevant to the Title VII claim that was viable (the failure to promote plaintiff to the Sergeant-State Investigator position in 2009). The district court committed legal error and violated the caselaw cited above by failing to assess this evidence in evaluating the sufficiency of plaintiff's Title VII claim. The prior acts of discrimination against plaintiff, reflected in the materials submitted to the court on summary judgment below (and detailed in the Statement of Facts above, incorporated here by reference) were relevant to plaintiff's claim that defendant's articulated reasons for its failure to promote plaintiff were pretextual. Because the district judge failed to assess this evidence prior to the promotion in question, this Court should reverse and remand the ruling below.

**II.    The district judge erred in failing to assess the sufficiency of plaintiff's failure to promote claim under a mixed-motives analysis, which was applicable because of at least three instances reflecting direct evidence of prohibited animus by defendant.**

As set forth above, conduct or statements which reflect directly the alleged discriminatory attitude and which bear directly on the contested employment decision constitute direct evidence. Starceski, 54 F.3d at 1096. In order to trigger a mixed-motives framework, "a plaintiff need only present sufficient evidence for a reasonable jury to conclude, by a preponderance of the evidence, that 'race, color, religion, sex, or national origin was a motivating factor for any employment practice.'" Desert Palace, Inc. v. Costa, 539 U.S. 90, 101, 123 S.Ct. 2148, 156 L.Ed.2d 84 (2003).

Here, the proofs presented on summary judgment present at least three instances of conduct or statements that reflect directly the alleged discriminatory attitude and bear directly on the contested employment decision:

First, "I was trying to go to training, this FBI Investigative School that lasts for two weeks. And the year before that, I had put in a request to go, and it was denied. And then the following year, I wrote up a memo and I asked to go again, and it was denied." (A587-88). Plaintiff affirmed, "Eventually, a number of DAG's [Deputy Attorney Generals with whom plaintiff worked] who were aware of plaintiff's credentials complained about the disparity in case assignments and

24

they became more equitable.  Plaintiff believes that Ken White at this time was

counseled about the manner in which plaintiff had been treated and since that time

he has treated plaintiff in an appropriate fashion." (A259-60, 384).  After plaintiff

was denied a second time to attend the FBI investigative school,

> I went and I told Jack McConnell about it, and he said this is
> ridiculous. But then Jack told me, well, what you did wrong was you
> should have came to me first, then I would go into Kenny's office,
> meaning Jack, and Jack was supposed to say how great this case -- I'm
> sorry, how great the training course was. And after he builds up the
> training course and it's good for me to go, then I was supposed to
> come in, and that's how I would get approved. So after that, I'm just
> sitting at my desk, and Jack McConnell comes back, and he said he
> just spoke with Nancy because he believed and he called Kenny a
> racist." … "And shortly after he came back, I saw Nancy Beiger go
> into Kenny's office and close the door." … "So after that happened, he
> started treating me equal."  "I started getting cases such as the
> aggravated sexual assault cases. I started being able to go to training."

[A588, 629-30, 636]

Second, plaintiff contended that the DCJ's failure to promote her to the

position of Sergeant-State Investigator was the culminating event in a longer

history of race and gender discrimination against her during her employment with

the DCJ. (A5-8).  Plaintiff contends that her "first experiences with questionable

treatment" within DCJ occurred after she was assigned to the Prosecutor's and

Police Unit in 2002 under the supervision of Lt. Ken White.  In addition to

plaintiff, White was the supervisor of two white males and one African-American

25

male.  (A289).  Plaintiff contended that White treated her differently than the males under his supervision.  (A473).  After plaintiff came under White's supervision, she noticed that she was not receiving any case assignments, notwithstanding her experience in both the Division and as a local law enforcement officer.  She was "handed embarrassingly minimal assignments such as acting as a courier to deliver discovery materials.  While this was occurring, Investigator James Wrightson, who was one of the white males[,] was receiving the bulk of the cases."  (A259).  Plaintiff testified that the "questionable treatment" by Lt. White began not long after she came under his supervision, when she "noticed that I was not getting any cases, but other people were getting cases."  Plaintiff testified that she was receiving minimal assignments from Lt. White based upon her race and gender.  (A99, 259-60).   Plaintiff noted that Lt. White "stated to plaintiff that there was a 'good old boy network' and that plaintiff was not part of that network."  (A245).

Third, after she was not promoted to Sergeant-State Investigator position in 2009, plaintiff spoke with Deputy Chief Beiger.  "She advised me that in her opinion my delay in responding to the two questions … hurt my candidacy."  Toward the end of the conversation, however, Deputy Chief Beiger "stated that I had 'to learn to get along.'"  Plaintiff affirmed below, "I do not know of anything

that would have triggered this comments, other than my pending EEO complaint."
(A489).

These were instances of conduct or statements by defendant that reflect directly the alleged discriminatory attitude and bear directly on the contested employment decision.  The district judge erred in failing to assess the sufficiency of plaintiff's proofs under a mixed-motives analysis.  Doing so shows that plaintiff presented sufficient direct evidence "that an illegitimate criterion was a substantial factor in the" failure to promote plaintiff to the Sergeant-State Investigator position.  This rendered plaintiff's Title VII claim trial-worthy, as the burden then shifted to the defendant "to convince the trier of fact that it is more likely than not that the decision would have been the same absent consideration of the illegitimate factor."  Brown, 581 F.3d at 182; Price Waterhouse, supra, 490 U.S. 228; cf. McDevitt v. Bill Good Builders, Inc., 175 N.J. 519, 528, 531 (2003)(adopting mixed-motive analysis and ruling that supervisor's head nod was sufficient direct evidence to defeat a motion for summary judgment in a mixed motive case).

### III.  Even if a mixed-motives analysis was not applicable, plaintiff presented sufficient evidence to survive summary judgment on a pretext theory.

Alternatively, a reasonable jury could find that defendant's claimed reason for failing to promote plaintiff (that she did not perform well on the third, interview

phase of the selection process) was pre-textual, and that the actual reason for the

non-promotion was, at least in part, because of plaintiff's race and/or gender in

violation of Title VII.

Plaintiff presented a *prima facie* case of pretext – sufficient evidence to

permit a reasonable jury to find that defendant's claimed reason for not promoting

her was concocted and that the actual reason was, at least in part, because of

plaintiff's race and/or gender.  Though defendant claims that it did not promote

plaintiff because she performed poorly in the interview process for the Sergeant-

State Investigator position, plaintiff noted inconsistencies that would permit a

reasonable jury to find this reason offered by DCJ unworthy of credence.  Plaintiff

admitted that there were two questions for which she did not have an immediate

response.  She hesitated to answer the first question – "how she would handle a

disagreement with a co-worker" – because the first example she thought of was

that she filed an EEO complaint (which was pending at the time), but she

eventually thought of another example and provided her answer.  The second

question – "what are the negatives within the division" – was "set up for failure."

This question is "similar to the question 'when did you stop beating your wife?' as

it presumes that the issue under discussion is valid and that you agree that it is or

had occurred."   Plaintiff asked for additional time to answer the question, and

when she later offered to provide the panel with her response, "she was told not to bother." (A5-8)

Contrary to defendant's claims, plaintiff did not have a "deer in the headlights look" during her interview, noting she is an experienced interviewer and has worked undercover. The depositions showed inconsistencies in the defendant's explanation for this failure to promote plaintiff. Deputy Chief Binn stated that plaintiff did not answer the question. (A764). First Deputy Chief Beiger could not remember what question caused the alleged look. (A726). A reasonable juror could believe that she would not and did not display a "deer in the headlights look" during the interview as defendant claimed and did not perform poorly in the interview. Indeed, Deputy Chief Beiger, in her deposition, testified "we were all impressed with the people who interviewed. We were very impressed with the whole panel. It was a very difficult decision…" (A324). Beiger's statement contradicted the DCJ's claim during the litigation below that plaintiff had a "poor performance" during the interview and that this was the reason for her non-promotion.

Plaintiff contended that the questions put to her were part of a subjective interview, "a ready tool for discrimination," and reflective of the disparate treatment plaintiff had received throughout her tenure at the DCJ. (A10-12, 263).

29

Defendant provided no other reason for its decision not to promote plaintiff.

The interview sheets and current resumes of the candidates were destroyed by the defendant, moreover, (A796-97), precluding assessment of defendant's comments about the other individual candidates, how they performed on the interview, etc.  Because the notes were destroyed, we do not know if the questions asked of each candidate were substantially similar.  See Barber v. CSX Distribution Servs., 68 F.3d 694, 700-01 (3d Cir. 1995)(evidence of employer's inconsistent interview techniques part of issue in discrimination matter).  All of this added further to the basis on which a jury could find that the defendant's proffered reason for not promoting plaintiff was pre-textual.

The principle of spoliation of evidence adds to the basis on which a reasonable jury can find pretext in plaintiff's case.  Spoliation is "the destruction or significant alteration of evidence, or the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation."  Mosaid Technologies Inc. v. Samsung Electronics Co., Ltd., 348 F.Supp.2d 332, 335 (D. N.J. 2004).  The Court has instructed lower courts to evaluate "(1) the degree of fault of the party who altered or destroyed the evidence; (2) the degree of prejudice suffered by the opposing party; and (3) whether there is a lesser sanction that will avoid substantial unfairness to the opposing party and, where the offending party is

30

seriously at fault, will serve to deter such conduct by others in the future." <u>Schmid v. Milwaukee Elec. Tool Corp.</u>, 13 F.3d 76, 79 (3d Cir. 1994).

Among the lesser sanctions that a court may order is a "spoliation inference" allowing a jury instruction permitting an inference that the destroyed evidence might or would have been unfavorable to the position of the offending party. Four requirements must be met in order for the Court to impose a spoliation inference. First, it is essential that the evidence in question be within the party's control. Second, it must appear that there has been actual suppression or withholding of the evidence. Third, the evidence destroyed or withheld was relevant to claims or defenses. And fourth, it was reasonably foreseeable that the evidence would later be discoverable. <u>Mosaid</u>, 348 F.Supp.2d at 336. The first three prongs are met in this case: the evidence that is missing -- the interview sheets and resumes of the individuals who were part of the panel interviews -- was always in the control of defendants, (A796-97); defendants have testified that such documents existed but cannot be found, (A796-97); and the evidence directly related to the alleged reason that plaintiff, the defendant claims, did not pass the panel interview (her performance and failure to answer questions). The destroyed or lost evidence would clarify which questions were not answered and to what extent. The missing resumes are relevant to determine the actual qualifications of the individuals and

whether less qualified candidates were advanced over plaintiff.  The law of spoliation added further to the basis on which plaintiff's Title VII claim should have been deemed trial worthy in the district court below.

Plaintiff also submitted proofs showing how qualified she was for the Sergeant-State Investigator position.  She was evaluated for her work performance in 2009 and she was given a rating of four, "exceeds expectations." Plaintiff was better qualified than the majority of the applicants because she had 20 years of law enforcement experience; she was diversified and her experience included working as a patrol officer, on a narcotics task force, in a Medicaid fraud unit, in drug diversion, in the narcotics unit, she's been loaned out to County prosecutor's offices doing undercover buys, she has been on the shooting response team, where she was also a lead detective.  She had completed administrative investigations and Internal Affairs Investigations. Plaintiff listed Bob Stemmer, currently a Lieutenant with only 14 years of experience, as being less qualified than she. She also stated that both Noelle Hall and Tracy Keller, white females had fewer years of employment and their experience was only with the Division of Criminal Justice. Jon Powers, Andrea Salvatini and Joseph Jaruszewski were other individuals, all are white, who were on the list, and plaintiff identified them as individuals with fewer years of experience and less well rounded experience.  This added to the

32

basis for a jury's finding that the failure to promote plaintiff was part of the disparate treatment plaintiff received because of her race and gender, plaintiff contended below.  (A615-17).

The prior history of disparate treatment of plaintiff by defendant further permits a reasonable jury to find the defendant's proffered reason for the non-promotion to be unworthy of credence.  (A5-8).  Plaintiff's "first experiences with questionable treatment" within DCJ occurred after she was assigned to the Prosecutor's and Police Unit in 2002 under the supervision of Lt. Ken White.  In addition to plaintiff, White was the supervisor of two white males and one African-American male.  (A289).  Plaintiff contended that Supervisor White treated her differently than the males under his supervision.  (A473).  After plaintiff came under White's supervision, she noticed that she was not receiving any case assignments, notwithstanding her experience in both the Division and as a local law enforcement officer previously.  Plaintiff was "handed embarrassingly minimal assignments such as acting as a courier to deliver discovery materials. While this was occurring, Investigator James Wrightson, who was one of the white males[,] was receiving the bulk of the cases."  (A259).

Plaintiff testified that the "questionable treatment" by Lt. White began not long after she came under his supervision, when she "noticed that I was not getting

33

any cases, but other people were getting cases." Plaintiff testified that she was

receiving minimal assignments from Lt. White based upon her race and gender.

(A99, 259-60). Plaintiff noted that Lt. White "stated to plaintiff that there was a

'good old boy network' and that plaintiff was not part of that network." (A245).

In another instance noted by plaintiff below, plaintiff detailed her disparate

treatment as a member of the DCJ's Shooting Response Team. Because of the

emergency nature of the team, "team members in plaintiff's unit were provided

with vehicles equipped with lights and a siren" – "except plaintiff, the lone female.

This became quite distressing when on one occasion she had to respond to an

incident by driving through rush hour traffic on Interstate 295 using only a

dashboard dome light." (A259). White was denying plaintiff training

opportunities as well, which further dashed any hope for advancement. (A587-88).

"I was trying to go to training, this FBI Investigative School that lasts for two

weeks. And the year before that, I had put in a request to go, and it was denied.

And then the following year, I wrote up a memo and I asked to go again, and it was

denied." (A587-88). Plaintiff affirmed, "Eventually, a number of DAG's [Deputy

Attorney Generals with whom plaintiff worked] who were aware of plaintiff's

credentials complained about the disparity in case assignments and they became

more equitable. Plaintiff believes that Ken White at this time was counseled about

34

the manner in which plaintiff had been treated and since that time he has treated

plaintiff in an appropriate fashion." (A259-60, 384). After plaintiff was denied a

second time to attend the FBI investigative school,

> I went and I told Jack McConnell about it, and he said this is
> ridiculous. But then Jack told me, well, what you did wrong was you
> should have came to me first, then I would go into Kenny's office,
> meaning Jack, and Jack was supposed to say how great this case -- I'm
> sorry, how great the training course was. And after he builds up the
> training course and it's good for me to go, then I was supposed to
> come in, and that's how I would get approved. So after that, I'm just
> sitting at my desk, and Jack McConnell comes back, and he said he
> just spoke with Nancy because he believed and he called Kenny a
> racist." … "And shortly after he came back, I saw Nancy Beiger go
> into Kenny's office and close the door." … "So after that happened, he
> started treating me equal." "I started getting cases such as the
> aggravated sexual assault cases. I started being able to go to training."

[A588, 629-30, 636]

In February 2007 plaintiff came under the supervision of Lieutenant Barry

Riley, who also subjected her to disparate treatment, plaintiff contended in the

court below. (A259-60). From February 2007 through February 2008, plaintiff

was "harassed" and treated in a disparate fashion by her then supervisor Lt. Riley

in the OIFP, Auto Unit. As soon as plaintiff came under Lt. Riley's supervision,

"he subjected her to hyper-scrutiny," including continually questioning plaintiff

about her whereabouts. (A103, 259). The scrutiny was "so intense," plaintiff

affirmed below, that she "began maintaining a diary of the more significant events

to protect herself." Riley questioned plaintiff repeatedly about her whereabouts –

without basis to do so and unlike his treatment of others under his supervision.

(A259-60). Riley also made unsolicited comments that plaintiff was not fit for

promotion, stating in a September 17, 2007 meeting, "If I had to write a

promotional justification for you it would be shallow." Plaintiff continued to

receive disparate treatment in regard to vehicle distribution as well. (A260).

Plaintiff notified her employer about the disparate treatment. In February

2007, plaintiff advised Deputy Chief Nancy Beiger, in a meeting, that Supervisor

Riley had harassed and discriminated against her. Plaintiff was transferred to a

new supervisor as a result. (A486, 535). In June 2009, plaintiff spoke with Hester

Agudosi about disparate treatment: "Barry Riley abruptly retired the following

month." (A592).

Then, after defendant did not promote plaintiff to the Sergeant-State

Investigator position, plaintiff spoke with Deputy Chief Beiger. "She advised me

that in her opinion my delay in responding to the two questions … hurt my

candidacy." Plaintiff noted, however, that "[t]oward the end of the conversation

she stated that I had 'to learn to get along.'" Plaintiff affirmed, "I do not know of

anything that would have triggered this comments, other than my pending EEO

complaint." (A489). Plaintiff noted a conversation with Lieutenant White as well,

who told plaintiff that she should have "hope for the future because the administration was trying to change the promotion process because admittedly, 'in the past it has been the good old boy network.'" (A489).

These proofs added to the basis on which a reasonable jury could find unlawful discrimination. Though Lieutenant White (when confronted by DCJ's investigators about plaintiff's disparate treatment accusations) denied discriminating against plaintiff in any manner, and said that he considered plaintiff a very good investigator, (A577-78), the fact is that plaintiff was not promoted or even submitted for promotion by Lieutenant White. As plaintiff affirmed, White's "very positive" evaluations contrasted sharply with "White's behind closed doors actions to derail the Plaintiff's career:"

> For instance "in 2004, I requested a promotion, and Kenny told me to put it in writing, and he said put it in writing and give it -- and if Nancy Beiger has any suggestions or has anything to add or whatever, he would let me know," and then "a year later, in 2005, we had a unit meeting where Nancy Beiger was there, Kenny and some other people that Nancy Beiger supervised. Nancy asked us all for our resumes because she was putting us in for promotion. I said, did you get the memo I submitted to Kenny, she said no." In addition later in connection with the promotion that is the subject of this action: "I'm actually surprised [from a review of documents produced in discovery] that Kenny White did not recommend me since I was under him for five years, and I notice that Kenny White recommended one individual, a retired trooper that he never supervised." "Lieutenant White, although I was under him for five years and he wrote me my evaluation that I was an asset to the Division and that I had been put in for promotion, I was considered for a promotion years

ago, never recommended me." [A586, 599-601]

This was reflected in plaintiff's history of employment with the defendant and in the DCJ's employment statistics overall. Plaintiff noted in her submissions below that currently within the DCJ there was only one female lieutenant (white), no black women deputy chiefs, no black women lieutenants and no black women sergeants. (A598). Of the 26 lieutenants within the DCJ in 2008, three were black males, four were white females, and the rest were white males. There were no black females. (A606). Since 2010, the DCJ had hired 22 people, but only one was African-American, a female, who was placed in the position of Investigator Trainee; there were no hires for positions that carried a gun. Of the minorities that the DCJ did hire, they were secretaries or tech aides. (A616). This disparity was consistent with plaintiff's own personal experience during her employment with the DCJ. As plaintiff affirmed: "I have seen white males with less law enforcement experience than myself quickly advance. Over the last four years, virtually no blacks have been hired. Presently out of 72 superior officers (Sergeant to Deputy Chief) there is only one black female, Deputy Chief Binn… Furthermore, this situation is being exacerbated by the fact that over the last few years most of the new hires have been white males." (A489). Cf. Hazelwood School District v. United States, 433 U.S. 299, 307-08, 97 S.Ct. 2736, 2741, 53

38

L.Ed.2d 768 (1977) (statistical proof of a substantial or "gross" disparity in treatment of protected and unprotected groups may make out the plaintiffs' *prima facie* case and justify the inference of discriminatory animus); <u>Payne v. Travenol Laboratories, Inc.</u>, 673 F.2d 798, 817 (5th Cir.), <u>cert. denied</u>, 459 U.S. 1038, 103 S.Ct. 451-52, 74 L.Ed.2d 605 (1982).  This pattern and practice evidence propels plaintiff's disparate treatment claim further.  <u>Griffin v. Board of Regents</u>, 795 F.2d 1281, 1287 (7th Cir. 1986).

All of these proofs submitted on summary judgment below cast doubt on the credibility of defendant's proffered reason for not promoting plaintiff and raise an inference that defendant acted for a prohibited reason instead.  An employer's lack of credibility and evidence of inconsistencies and/or anomalies in the record can support an inference that the employer did not act for its stated reason and permit a reasonable jury to find that the real reason for the termination was an improper one.  <u>Josey v. John R. Hollingsworth Corp.</u>, 996 F.2d 632, 638 (3d Cir. 1993). The record below contains sufficient weaknesses, implausibilities, inconsistencies, incoherencies, and contradictions in defendant's proffered reason for plaintiff's non-promotion such that a reasonable factfinder can find the asserted reason "unworthy of credence" and hence infer "that the employer did not act for [the

asserted] non-discriminatory reasons" but for a prohibited one.  The district judge

thus erred in dismissing plaintiff's Title VII claim as a matter of law.

### IV.    The district judge erred in failing to assess the sufficiency of plaintiff's Title VII claim under a retaliation analysis.

The <u>McDonnell Douglas</u> burden shifting scheme applies to retaliation claims

as well.  To establish a *prima facie* case of retaliation, a plaintiff must provide

evidence that: "(1) she engaged in activity protected by Title VII; (2) the employer

took an adverse employment action against her; and (3) there was a causal

connection between her participation in the protected activity and the adverse

employment action."  <u>Moore v. City of Philadelphia</u>, 461 F.3d 331, 340-41 (3d Cir.

2006) (quoting <u>Nelson v. Upsala Coll.</u>, 51 F.3d 383, 386 (3d Cir. 1995)).  "[T]he

anti-retaliation provision of Title VII protects those who participate in certain Title

VII proceedings ... and those who oppose discrimination made unlawful by Title

VII…"  <u>Id.</u> (citing <u>Slagle v. County of Clarion</u>, 435 F.3d 262, 266 (3d Cir. 2006)).

The district judge erred in dismissing plaintiff's Title VII claim without

applying this law.  As set forth above, plaintiff had a pending EEO complaint

against Lieutenant Barry Riley at the time she applied for the Sergeant-State

Investigator position.  (A5-8, 653-54).  A reasonable jury could find that the

questions posed to plaintiff during the interview phase reflected the DCJ's

discrimination against plaintiff for her prior complaint lodged against Lieutenant

40

Barry Riley.  After defendant did not promote plaintiff to the Sergeant-State Investigator position, plaintiff spoke with Deputy Chief Beiger.  "She advised me that in her opinion my delay in responding to the two questions … hurt my candidacy."  Plaintiff noted, however, that "[t]oward the end of the conversation she stated that I had 'to learn to get along.'"  Plaintiff affirmed, "I do not know of anything that would have triggered this comments, other than my pending EEO complaint."  (A489).  Plaintiff noted a conversation with Lieutenant White as well, who told plaintiff that she should have "hope for the future because the administration was trying to change the promotion process because admittedly, 'in the past it has been the good old boy network.'"  (A489).  These proofs, and the other proofs detailed in the Statement of Facts above (incorporated here by reference), permit a reasonable jury to find that there was a causal connection between plaintiff's prior EEO complaint and the decision not to promote her to the Sergeant-State Investigator position.  Moore, 461 F.3d at 340–41.  The district judge erred in failing to apply this retaliation caselaw to assess the sufficiency of plaintiff's unlawful discrimination claim, warranting reversal and reinstatement by this Court on appeal.

## CONCLUSION

For all these reasons, the Court should reverse the district court's decision below and remand this matter with direction that plaintiff's Title VII claim against defendant be reinstated and the matter scheduled for trial before a jury.

Respectfully submitted,

HEGGE & CONFUSIONE, LLC
P.O. Box 366
Mullica Hill, New Jersey 08062-0366
(800) 790-1550; (888) 963-8864 (fax)
mc@heggelaw.com

*Michael Confusione*

By: Michael Confusione (MC-6855)
    Counsel for Plaintiff-Appellant,
    Lamonica Cross

Dated: September 29, 2014

## <u>CERTIFICATION OF BAR MEMBERSHIP</u>

I certify that I am an attorney-at-law of the States of New Jersey and New York and the Commonwealth of Pennsylvania and a member of the Bar of the United States Court of Appeals for the Third Circuit.  I am a member of the firm of Hegge & Confusione, LLC, attorneys for plaintiff-appellant.

*Michael Confusione*

_____

Dated: September 29, 2014

## CERTIFICATE OF SERVICE

I certify that today PDF copies of Appellant's Brief with attached Volume I of Appendix and Appendix Volumes II, III, and IV were filed and served electronically via the PACER CM/ECF filing system.  7 paper copies of the Brief with attached Volume I of Appendix and 4 copies of Appendix Volumes II, III, and IV were filed today via United States Mail upon Office of the Clerk, United States Court of Appeals for the Third Circuit, 21400 United States Courthouse, 601 Market Street, Philadelphia, Pennsylvania 19106-1790.

I certify that service of Appellant's Brief with attached Volume I of Appendix and Appendix Volumes II, III, and IV was through PACER CM/ECF filing system via notification of filing upon the following Filing User and counsel for defendant/appellee:

Rimma Razhba, DAG
Office of the Attorney General
Division of Law
25 Market Street
P.O. Box 112
Trenton, NJ 08625-0112

*Michael Confusione*

_____
Michael Confusione

Dated: September 29, 2014

44

## <u>CERTIFICATE OF ELECTRONIC FILING AND VIRUS CHECK</u>

I certify that today, the same day I have filed with the Court paper copies of the Brief and Appendices as noted above, I caused to be sent via PACER CM/ECF filing system, including notification of filing upon Filing User Rimma Razhba, DAG, counsel for respondent-appellee, PDF copies of Appellant's Brief with attached Volume I of Appendix and Appendix Volumes II, III, and IV, the texts of which are identical to the paper copies I have filed.  I further certify that a virus check was performed with Norton Anti-Virus software, Norton Security Suite Version 5.2.2.3 and that no virus was found.

*Michael Confusione*

_____

Michael Confusione

Dated: September 29, 2014

## CERTIFICATE OF COMPLIANCE WITH
## <u>BRIEF LENGTH/TYPE-VOLUME LIMITATION REQUIREMENT</u>

I certify that the accompanying Brief of Appellant, which uses a proportional 14-Point Font in Times New Roman Style, contains no more than 14,000 words (Microsoft Word was used to determine the word count) in accordance with F.R.A.P. 32(a)(7).

*Michael Confusione*

_____

Michael Confusione

Dated: September 29, 2014

46

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| LAMONICA CROSS, | : | CIVIL ACTION |
| | : | No. 11-3726 (MLC) |
| Plaintiff, | : | |
| | : | Judge Mary L. Cooper |
| v. | : | |
| | : | |
| STATE OF NEW JERSEY, | : | |
| DIVISION OF CRIMINAL JUSTICE | : | |
| | : | |
| Defendant. | : | |

## NOTICE OF APPEAL

Notice is hereby given that plaintiff Lamonica Cross hereby appeals to the United States Court of Appeals for the Third Circuit from the May 14, 2014 Order of the United States District Court granting defendant's motion for summary judgment and dismissing plaintiff's claims with prejudice.

Respectfully submitted,

*Michael Confusione*

Michael Confusione (MC-6855)
Hegge & Confusione, LLC
P.O. Box 366
Mullica Hill, NJ 08062-0366
(800) 790-1550; (888) 963-8864 (fax)
mc@heggelaw.com

Counsel for Plaintiff/Appellant,
Lamonica Cross

Dated:  June 12, 2014

10

**A1**

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

|  |  |  |
|---|---|---|
| LAMONICA CROSS, | : |  |
|  | : | CIVIL ACTION NO. 11-3726 (MLC) |
| Plaintiff, | : |  |
|  | : | **ORDER & JUDGMENT** |
| v. | : |  |
|  | : |  |
| STATE OF NEW JERSEY, | : |  |
| DIVISION OF CRIMINAL JUSTICE, | : |  |
|  | : |  |
| Defendant. | : |  |

For the reasons stated in the Court's Memorandum Opinion, dated May 14, 2014,

**IT IS** on this      14th      day of May, 2014, **ORDERED** that the motion for summary

judgment by the defendant, State of New Jersey, Division of Criminal Justice (dkt. entry

no. 34) is **GRANTED**; and it is further

**ADJUDGED** that judgment is entered in the defendant's favor and against the

plaintiff on the Title VII failure to promote claim and on any derivative claim for punitive

damages; and it is further

**ORDERED** that, as no other claims remain viable, the Clerk of the Court

designate the action as **CLOSED**.


        s/ Mary L. Cooper
**MARY L. COOPER**
United States District Judge

**A2**

**NOT FOR PUBLICATION**

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

|  |  |  |
|---|---|---|
| LAMONICA CROSS, | : | |
| | : | CIVIL ACTION NO. 11-3726 (MLC) |
| Plaintiff, | : | |
| | : | **MEMORANDUM OPINION** |
| v. | : | |
| | : | |
| STATE OF NEW JERSEY, | : | |
| DIVISION OF CRIMINAL JUSTICE, | : | |
| | : | |
| Defendant. | : | |

**COOPER, District Judge**

The plaintiff, Lamonica Cross (the "plaintiff"), brought this action against the

defendant, State of New Jersey, Division of Criminal Justice ("DCJ"), alleging claims

under Title VII of the Civil Rights Act of 1964, as amended 42 U.S.C. § 2000e et seq.

("Title VII"), and the New Jersey Law Against Discrimination, N.J.S.A. § 10:5-1 et seq.

("NJLAD").  (See dkt. entry no. 1, Compl. at ¶¶ 4-5.)  The Court dismissed all of the

plaintiff's claims except her Title VII claim relating to "her allegations surrounding the

defendant's decision not to promote her" (the "Remaining Claim").  (See dkt. entry no.

12, 1-26-12 Order.)  DCJ now moves for summary judgment in its favor and against the

plaintiff, pursuant to Federal Rule of Civil Procedure ("Rule") 56, as to the Remaining

Claim (the "Motion").  (See dkt. entry no. 34, Notice of DCJ Mot.)  The plaintiff opposes

the Motion.  (See generally dkt. entry no. 38, Opp'n Br.)

The Court will resolve the Motion on the papers and without oral argument pursuant to Local Civil Rule 78.1(b).  The Court, for the reasons stated herein, will grant the Motion.

## I.    SUMMARY JUDGMENT STANDARD

Motions for summary judgment are governed by Rule 56, which provides that the Court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a).  The movant has the initial burden of proving the absence of a genuinely disputed material fact relative to the claims in question.  Celotex Corp. v. Catrett, 477 U.S. 317, 330 (1986).  Material facts are those "that could affect the outcome" of the proceeding, and "a dispute about a material fact is 'genuine' if the evidence is sufficient to permit a reasonable jury to return a verdict for the non-moving party."  Lamont v. New Jersey, 637 F.3d 177, 181 (3d Cir. 2011) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)).  The burden on the movant may be discharged by pointing out to the district court that there is an absence of evidence supporting the nonmovant's case.  See Celotex, 477 U.S. at 323.

If the movant demonstrates an absence of genuinely disputed material facts, then the burden shifts to the nonmovant to demonstrate the existence of at least one genuine issue for trial.  See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586–87 (1986); Williams v. Borough of W. Chester, Pa., 891 F.2d 458, 460–61 (3d Cir. 1989).  "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial."  Matsushita Elec. Indus.

**A4**

Co., 475 U.S. at 587 (internal quotation marks omitted).  The nonmovant cannot, when

demonstrating the existence of issues for trial, rest upon argument; the nonmovant must

show that such issues exist by referring to the record.  See Fed.R.Civ.P. 56(c)(1).

When determining whether a genuine issue of material fact exists, the court must

view the evidence in the light most favorable to the nonmovant and draw all reasonable

inferences in that party's favor.  Scott v. Harris, 550 U.S. 372, 380 (2007); Wishkin v.

Potter, 476 F.3d 180, 184 (3d Cir. 2007).  If the nonmovant fails to demonstrate that at

least one genuine issue exists for trial, then the Court must determine whether the movant

is entitled to judgment as a matter of law.  See McCann v. Unum Provident, 921

F.Supp.2d 353, 357 (D.N.J. 2013).  "A movant is entitled to judgment as a matter of law

if, at trial, no reasonable jury could find for the non-moving party."  Id.

## II.    FINDINGS OF FACT

The plaintiff, who identifies herself as an African-American female, commenced

employment with DCJ in August 2000, as a State Investigator II.  (See dkt. entry no. 34-

1, DCJ Statement of Material Facts ("DCJ SOF") at ¶ 5; dkt. entry no. 38-1, Pl. Statement

of Material Facts ("Pl. SOF") at ¶ 5.)  Prior to her employment with DCJ, the plaintiff

served as a municipal police officer for Winslow Township, New Jersey.  (See DCJ SOF

at ¶ 7; Pl. SOF at ¶ 7.)  The plaintiff worked in the DCJ Medicare Fraud Unit from 2000-

2001, the DCJ Drug Diversion Unit from 2001-2002, and the DCJ Prosecutor and Police

Unit from 2002-2007.  (See DCJ SOF at ¶¶ 11-14; Pl. SOF at ¶¶ 11-14.)  In 2007, the

plaintiff was transferred to the Office of Insurance Fraud ("OIFP"), Auto Fraud Unit, and

in February 2008 she was reassigned to the OIFP, Property and Casualty Unit.  (See DCJ

SOF at ¶ 15; Pl. SOF at ¶ 15.)  In approximately December 2012 or January 2013, the

plaintiff was transferred to the OIFP, Medicaid Fraud Unit, where she remains employed

as a Detective I.  (See DCJ SOF at ¶ 17; Pl. SOF at ¶ 17.)[1]

On or about July 23, 2009, the plaintiff applied for a promotion to the position of

Sergeant-State Investigator.  (See DCJ SOF at ¶ 82; Pl. SOF at ¶ 82.)  Pursuant to a job

vacancy notice, candidates for the Sergeant-State Investigator position were required to

have a bachelor's degree and a minimum of five years of investigatory experience as a

sworn law enforcement officer.  (See DCJ SOF at ¶ 83; Pl. SOF at ¶ 83.)  The promotion

process for the position consisted of four phases: "1) Credential Review/Lieutenant

Recommendations; 2) Written Interview; 3) Panel Interview consisting of Deputy Chiefs

and Deputy Attorneys General; and 4) An executive Interview consisting of senior and

executive staff."  (See DCJ SOF at ¶ 84; Pl. SOF at ¶ 84.)  Approximately ninety-six

candidates applied for the position.  (See DCJ SOF at ¶ 85; Pl. SOF at ¶ 85.)

The plaintiff passed the first phase of the process – the credential

review/Lieutenant recommendations – even though she was not recommended by any

Lieutenants for the promotion.  (See DCJ SOF at ¶ 86; Pl. SOF at ¶ 86.)  She passed

because she had a bachelor's degree and a minimum of five years of investigatory

experience as a sworn law enforcement officer.  The plaintiff also passed the second

---

[1] In 2008, the name of the plaintiff's title was changed from State Investigator II to Detective I.
(See DCJ SOF at ¶ 6; Pl. SOF at ¶ 6.)  This change was not a promotional action, rather, it was
prompted by a revision of the title series for the criminal investigative staff of the DCJ.  (See id.)
The title of Detective I was equivalent to the old title of State Investigator II.  (See Pl. SOF at ¶
17.)

**A6**

phase of the process – the written interview - which consisted of a written examination

that was graded blindly by Lieutenants.  (See DCJ SOF at ¶ 87; Pl. SOF at ¶ 87.)

The plaintiff thereafter, along with approximately thirty of the initial ninety-six

applicants, moved onto the third phase of the promotion process – the panel interview.

(See DCJ SOF at ¶¶ 88, 92; Pl. SOF at ¶¶ 88, 92.)  The interview panel consisted of the

five Deputy Chiefs at the time; of the five Deputy Chiefs, one was a white female and

one was an African-American female.  (See DCJ SOF at ¶¶ 90-91; Pl. SOF at ¶¶ 90-91.)

DCJ argues that the plaintiff performed poorly on the phase III panel interview,

and it was because of her poor performance on the panel interview that she did not move

on to phase IV and ultimately was not promoted.  The plaintiff conversely alleges that

DCJ failed to promote her to the position of Sergeant-State Investigator, due to her race

and gender.  (See DCJ SOF at ¶ 4; Pl. SOF at ¶ 4.)  In support of her claims, the plaintiff

argues that certain questions asked by the phase III panelists were discriminatory in

nature.  (See DCJ SOF at ¶ 94; Pl. SOF at ¶ 94.)  The plaintiff claims that two questions

in particular were aimed at disclosing whether candidates had previously made Equal

Employment Opportunity ("EEO") complaints against DCJ: (1) "Did you ever have a

conflict in the DCJ with anyone and how did you resolve it?"; and (2) "What 'negatives'

do you perceive to exist within the Division."  (See DCJ SOF at ¶ 95; Pl. SOF at ¶ 95.)

The plaintiff testified that she was unable to answer the second question.  (See id.)

The plaintiff contends that these particular questions led her to believe that the

panelists were aware of an unrelated EEO complaint she filed previously.  (See id.; see

also dkt. entry no. 34-2, DCJ Br. at 2.)  When asked during her deposition whether the

5

**A7**

two questions were discriminatory based upon race and gender, however, the plaintiff

testified: "No, I believe it put me at a disadvantage."  (<u>See</u> DCJ SOF at ¶ 96; Pl. SOF at ¶

96; dkt. entry no. 34-8, Certification of Rimma Razhba, Ex. B-2, Cross Dep. 226:9-13,

Jan. 22, 2013.)  She also argues that the interview questions varied between the

applicants and that the panelists tailored the interview questions specifically toward her.

(<u>See</u> DCJ SOF at ¶ 97; Pl. SOF at ¶ 97.)

## III.   ANALYSIS

### A.   The <u>McDonnell Douglas</u> Burden-Shifting Framework

An employee alleging a failure to promote claim under Title VII proceeds under

the burden-shifting framework established in <u>McDonnell Douglas Corp. v. Green</u>, 411

U.S. 792, 802-03 (1973).  The first step requires the plaintiff to establish a prima facie

case of discrimination.  <u>See</u> <u>McDonnell Douglas Corp.</u>, 411 U.S. at 802.  In order to

establish a prima facie case, the employee must demonstrate: (1) that she was a member

of a protected class; (2) that she applied and was qualified for a job for which the

employer was seeking applicants; (3) that, despite her qualifications, she was rejected;

and (4) that another, not in the protected class, was treated more favorably.  <u>Id.</u>; <u>Fuentes</u>

<u>v. Borough of Watchung</u>, 286 Fed.Appx. 781, 784 (3d Cir. 2008).

If the employee succeeds in establishing a prima facie case, the burden shifts to

the employer to articulate some legitimate, nondiscriminatory reason for the failure to

promote.  <u>Id.</u>  "The employer satisfies its burden of production by introducing evidence

which, taken as true, would permit the conclusion that there was a nondiscriminatory

reason for the unfavorable employment decision."  <u>Fuentes v. Perskie</u>, 32 F.3d 759, 763

(3d Cir. 1994).  "The employer need not prove that the tendered reason <u>actually</u>

motivated its behavior, as throughout this burden-shifting paradigm the ultimate burden

of proving intentional discrimination always rests with the plaintiff."  <u>Id.</u> (emphasis in

original).  This is a "relatively light burden."  <u>See</u> <u>id.</u>

      Once the employer meets its burden, the burden of production shifts back to the

employee who must then show that the proffered reason is merely a pretext for actual

discrimination.  <u>See</u> <u>Fuentes</u>, 286 Fed.Appx. at 784.  "[T]o avoid summary judgment, the

plaintiff's evidence rebutting the employer's proffered legitimate reasons must allow a

factfinder reasonably to infer that each of the employer's proffered non-discriminatory

reasons was either a post hoc fabrication or otherwise did not actually motivate the

employment action (that is, the proffered reason is a pretext)."  <u>Fuentes</u>, 32 F.3d at 764

(emphasis and internal citations omitted).  "To discredit the employer's proffered reason,

however, the plaintiff cannot simply show that the employer's decision was wrong or

mistaken, since the factual dispute at issue is whether discriminatory animus motivated

the employer, not whether the employer is wise, shrewd, prudent, or competent."  <u>Id.</u> at

765.  "Rather, the non-moving plaintiff must demonstrate such weaknesses,

implausibilities, inconsistencies, incoherencies, or contradictions in the employer's

proffered legitimate reasons for its action that a reasonable factfinder could rationally

find them 'unworthy of credence,' and hence infer 'that the employer did not act for [the

asserted] non-discriminatory reasons.'"  <u>Id.</u> (emphasis omitted).  "While this standard

places a difficult burden on the plaintiff, '[i]t arises from an inherent tension between the

**A9**

goal of all discrimination law and our society's commitment to free decisionmaking by the private sector in economic affairs.'" <u>Id.</u>

> **B.    Application to this Case**

The Court need not address the prima facie case portion of the <u>McDonnell Douglas</u> burden-shifting framework because DCJ articulates a legitimate, nondiscriminatory reason for not promoting the plaintiff, and the plaintiff failed to produce evidence of pretext.  <u>See</u> <u>Allen v. Nat'l R.R. Passenger Corp. (Amtrak)</u>, 228 Fed.Appx. 144, 149-50 (3d Cir. 2007) (declining to address prima facie case portion where defendant proffered legitimate reasons for not promoting and there was no evidence of pretext).

DCJ avers that the reason the plaintiff was not promoted was because she performed poorly during the phase III panel interview.  (<u>See</u> DCJ Br. at 18.)  The panelists confirmed that the plaintiff had difficulty with the interview.  Deputy Chief Beiger testified that the plaintiff did not interview well, that there was a question that the plaintiff did not answer, that the plaintiff seemed like a "deer in the headlights" in response to many questions, and that she was "disappointed" in the plaintiff's interview. (<u>Id.</u>)  Deputy Chief Binn testified that the plaintiff "was not a clear frontrunner" and that there were candidates who answered all of the questions "and answered them very well." (<u>Id.</u> at 18-19.)  Deputy Chiefs Binn and Buecker both testified that the plaintiff failed to answer a question regarding how to motivate detectives in hard economic times.  (<u>Id.</u> at 19.)  Deputy Chief Binn testified that the plaintiff should have been able to answer this question, and her inability to do so "hurt her."  (<u>Id.</u>)  Deputy Chief Buecker stated that,

**A10**

when asked the question, the plaintiff's response was that she did not know and would get back to the panelists, but ultimately never answered the question.  (Id.)  He further testified that the plaintiff "was very unsure of herself during the process" and "seemed very intimidated and overwhelmed."  (Id.)  Deputy Chief Castellvi also confirmed that the plaintiff failed to answer a question during her interview.  (Id.)

At the conclusion of the panel interviews, the panelists ranked the candidates based on their performance during their respective interviews.  (Id. at 20.)  The plaintiff was ranked second to last – number 30 out of 31 – by the panelists.  (Id.)  The applicants whom the panelists chose to advance to phase IV – the Executive Interview – were chosen based upon their performance during the panel interviews, and it was unanimously agreed that the plaintiff would not advance.  (Id.)  Because the plaintiff did not move forward in the process, she was not placed on the final Sergeant promotional list.  (Id.)  The Court accordingly finds that DCJ has articulated a legitimate, non-discriminatory reason for not promoting the plaintiff.

The plaintiff argues that DCJ's legitimate, non-discriminatory reason "fails."  (See Opp'n Br. at 15.)  The plaintiff contends that there are inconsistencies that make the reason offered by DCJ unworthy of credence.  The plaintiff admits that there were two questions for which she did not have an immediate response.  (Id. at 16.)  She states that she hesitated to answer the first question – "how she would handle a disagreement with a co-worker" – because the first example she thought of was that she filed an EEO complaint, but she eventually thought of another example and provided her answer.  (Id. at 17.)  The plaintiff argues that, contrary to Deputy Chief Binn's testimony, she did in

9

**A11**

fact provide an answer to this question.  (Id.)  The plaintiff argues that the second

question – "what are the negatives within the division" – was "set up for failure."  (Id.)

The plaintiff maintains that this question is "similar to the question 'when did you stop

beating your wife?' as it presumes that the issue under discussion is valid and that you

agree that it is or had occurred."  (Id.)  The plaintiff states that she therefore asked for

additional time to answer the question, and when she later offered to provide the panel

with her response, "she was told not to bother."  (Id.)  The plaintiff contends that these

questions were part of a subjective interview and argues that such an interview is "a

ready tool for discrimination."  (Id. at 18.)

     The plaintiff also argues that she did not have a "deer in the headlights look"

during her interview.  (See id. at 19.)  She claims that, because she is an experienced

interviewer and has worked undercover, a reasonable juror could believe that she would

not display a "deer in the headlights look" during an interview.  (See id. at 19-20.)  The

plaintiff then argues that there was testimony that the questions changed as the interview

continued, and that such "inconsistent interview techniques" are discriminatory.  (See id.

at 20.)

     This evidence, however does not tend to show that DCJ's legitimate, non-

discriminatory reason for the employment decision is pretextual.  "An employer must be

granted substantial discretion to exercise subjective judgment in the rendering of

employment decisions, especially where, as here, the success of the business is largely

dependant [sic] upon the individual occupying the position."  Johnson v. Penske Truck

Leasing Co., 949 F.Supp. 1153, 1172 (D.N.J. 1996).  In Johnson, the interviewers

10

**A12**

indicated that the plaintiff did not perform well in her promotional interview.  See id. at

1176.  The court acknowledged that "[a]n interview is a subjective procedure," and that

"[h]ow an employee presents himself or herself at an interview is often a determining

factor in awarding a position."  Id.  The court continued:

> Johnson's opinion of her interview performance is not relevant.  What is
> critical is the perception of the Interviewers.  Johnson's allegation of
> pretext with regard to her poor interview performance is unfounded.  The
> evidence proffered does not raise a genuine issue of material fact.  It does
> not demonstrate that discrimination was more likely than not a motivating
> factor in the [employer's] decision, nor does it cast doubt upon [the
> employer's] legitimate, non-discriminatory reason to defeat summary
> judgment.

Id.

Just as in Johnson, the plaintiff's perception of her interview performance is not

relevant.  As such, the plaintiff is in no position to argue whether she had a "deer in the

headlights look," as the critical matter is the perception of the interviewers.  See id.  The

plaintiff complains of inconsistent interview techniques, but even though the plaintiff

carries the burden of demonstrating this, she concedes that "we do not know if the

questions asked of each candidate were substantially similar."  (See Opp'n Br. at 20.)

The only question the plaintiff provides sufficient proof was actually asked of her and not

of other candidates was a question about the duties of a Winslow Township police

sergeant.  (See id.)  This is a fair interview question and does not demonstrate that the

plaintiff was treated differently from any other applicants, or that the interviewers

demanded more from her during her interview.  The Court similarly finds that the two

interview questions the plaintiff allegedly had difficulty answering were typical and

**A13**

innocuous interview questions.  The plaintiff claims that she was "uncomfortable with" the two questions and "delayed answering" them.  (See id. at 5.)  But considering how such behavior would be objectively interpreted by interviewers, it seems reasonable that her failure to respond (or her delayed response) was detrimental to her performance. When asked during her deposition whether the two questions were discriminatory based upon race and gender, the plaintiff herself testified: "No, I believe it put me at a disadvantage."  (See Cross Dep. 226:9-13.)  DCJ furthermore proffered testimony from the panelists stating that the questions were standard questions asked of all applicants. (See DCJ SOF at ¶¶ 103, 105; Pl. SOF at ¶¶ 103, 105.)

The plaintiff has proffered no evidence that gives rise to a genuine issue of material fact.  The evidence rather demonstrates that the panelists perceived the plaintiff to have performed poorly during her panel interview.  Due to her performance on the panel interview, the plaintiff was ranked second to last – number 30 out of 31 – by the panelists.  (See DCJ Br. at 20.)  Also of note, though not dispositive, is the fact that Sherri Stevens, another African-American female, was found by the panel to have performed well during her panel interview.  She, along with nineteen other applicants, advanced to the phase IV executive interview.  (See id. at 13-14.)  The plaintiff's poor performance on the panel interview is a legitimate, non-discriminatory reason for not promoting her.  The plaintiff has not proffered any evidence tending to show that DCJ's explanation for the employment decision is pretextual.  The plaintiff accordingly is not able to defeat summary judgment.

**A14**

**IV.    CONCLUSION**

For the reasons stated, and for good cause showing, the Court will grant the motion for summary judgment.  The Court will issue an appropriate order and judgment.


                 _s/ Mary L. Cooper_____
                 **MARY L. COOPER**
                 United States District Judge

Dated: May 14, 2014

**A15**